IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | |
|---|---|
| GERARDO ALVA,<br><br>    Plaintiff,<br><br>V.<br><br>TEXAS A&M INTERNATIONAL UNIVERSITY, A MEMBER OF THE TEXAS A&M UNIVERSITY SYSTEM,<br><br>    Defendant. | COMPLAINT |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Gerardo Alva (hereinafter referred to as "Plaintiff") by and through his undersigned counsel, brings this Complaint against Defendant Texas A&M International University, a Member of the Texas A&M University System (hereinafter referred to as "Defendant" or "TAMIU"), and in support of said Complaint aver upon information and belief as follows:

**A.   Nature of Action**

1.     This is a Title IX retaliation case brought pursuant to the implied private right of action values set out by the Supreme Court in *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 176-78 (2005). Plaintiff's employment was terminated because he was vocal and opposed Texas A&M International University's practices that were in direct violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), a statute designed to eliminate, with some exceptions, discrimination on the basis of sex in any education program or activity

1

receiving federal financial assistance as well as to protect an individual from unlawful employment practices of an employer who retaliates against an employee because he has voiced his concerns or has done some act for the rights of a party being discriminated. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 (1969).

### B. Parties

2. Plaintiff was formerly employed as the Associate Vice President for Student Affairs and the Deputy Title IX Coordinator at Texas A&M International University. He is a resident and citizen of the State of Texas and of the United States.

3. Defendant is an institution of higher education chartered and existing under the law of the State of Texas. It receives federal financial assistance. Service of process may be delivered to its president Dr. Pablo Arenaz at 5201 University Boulevard, KLM 270D, Laredo, Texas 78041.

### C. Jurisdiction & Venue

4. The court has federal question jurisdiction of this case pursuant to 28 U.S.C. §1331.

5. Venue is proper because all of the acts, omissions and transactions made the basis of this suit occurred in the confines of the Southern District of Texas.

### D. Relevant Facts

6. Plaintiff began his employment with Texas A&M International University on September 1, 2001. He moved to Houston for family reasons from December 1, 2007 to

November 30, 2008. He returned to TAMIU, his Alma Mater, on December 1, 2008 as the Director of Student Activities. On September 1, 2015, he was promoted to a newly created position as the Associate Vice President for Student Affairs.

7. In this role, Plaintiff handled multiple responsibilities including: Deputy Title IX Coordinator, Primary Designated School Official for the F-1 visa US Immigration and Custom Enforcement Student Exchange and Visitor Program, Responsible Officer for the J-1 visa US Immigration and Custom Enforcement Student Exchange and Visitor Program, and the designated Senior Student Conduct Officer.

8. Plaintiff represented the Division of Student Success on multiple standing and ad-hoc University committees, serving as chair on the standing Behavioral Assessment Intervention Team, Deputy of the Title IX Committee, and chair of the Student Handbook Review Committee. His duties extended to being on-call for all emergency situations involving students enrolled on campus. He would meet regularly with the University Police Department to address any concerns to the University community.

9. Plaintiff was well respected on and off campus. In 2012 he was selected as Administrator of the Year by the University community. He was selected to serve as a state representative for the Association of Student Conduct Administrators, the leading national professional organization for conduct matters occurring on higher education institutions. In addition, he served on the Texas Dean of Students executive board serving as secretary for one term. He was a member of the board and was elected Chair in 2015 of Study Texas, a non-profit international organization focused on assisting international students to learn about study programs in the United States and Texas. He also served on the operating council of the Texas

International Education Consortium.  He presented at regional, national, and international conferences on various topics focused on student success. He assisted or led in obtaining grants totaling over $1 million to assist students.  He was also a contributing author of the world-renowned Student Leadership Challenge series.

10. In his fifteen (15) years of employment with TAMIU, Plaintiff has had various promotions and titles.  Specifically, in January of 2016, Plaintiff was named the Associate Vice President for Student Affairs, and among his many responsibilities, he was the Deputy Title IX Coordinator for the University.

11. Plaintiff led the Student Affairs Department into the 21st century.  Under his leadership, TAMIU transitioned to all online programs for student conduct, student activities, student health and recreational sports.  As a result, students were allowed access to services 24/7, increasing student participation, campus pride, and retention.  In addition, through his vision and leadership, TAMIU implemented co-curricular leadership programs and developed a multidimensional involvement platform.  His relationships extended past the students to also working collaboratively with faculty on multiple projects.  Through his leadership, Student Affairs grew student involvement and campus pride.

12. As the Associate Vice President for Student Affairs, Plaintiff had oversight for the offices and departments of Student Health Services, Student Conduct and Community Engagement, Student Orientation, Leadership and Engagement, and Recreational Sports.  He managed the day-to-day operations of International Engagement (Study Abroad/International Student Services) and Student Success Services (Title IX and Behavioral Services).

13. Among his roles, Plaintiff was also responsible for all allegations of sexual assaults involving students as well as all study abroad programs. During this time, Dr. Ray Keck was the President of TAMIU.

14. As the Title IX Deputy Coordinator, Plaintiff's duties included, but were not limited to, ensuring timely and equitable resolutions of complaints of sexual misconduct, sexual harassment, and protected-class discrimination involving all students on behalf of TAMIU.

15. He was responsible for ensuring compliance with federal regulations regarding Title IX, including the training of all incoming students and sharing information with the Title IX Coordinator and System Officials, as necessary, as well as ensuring that complaint timelines were followed. Plaintiff worked with faculty and staff to train them on legal changes, created a training for incoming freshmen students prior to the federal government requiring universities to enact one, and drafted and published all procedures relevant to Title IX for students, including a website dedicated to assault survivors.

16. Plaintiff and his staff collaborated with internal and external partners to raise awareness of sexual assault, domestic violence, and resources for survivors throughout the year. Some of these activities included purchasing purple athletic jerseys for the TAMIU soccer teams, as part of the national Domestic Violence Awareness Month, to raise awareness of domestic violence. In addition, Plaintiff took action to sponsor the production of the *Vagina Monologues* on campus; raise funds for two local non-profit organizations, Casa Misericordia and SCAN SASSI (Sexual Assault Services and Information); as well as host week-long events focused on safety and sexual assault, including the national initiative, "Take Back the Night." Plaintiff and

his staff also initiated the Safe Zone program to create awareness and allies for the LBGTQ students on campus.

17. Upon receipt of a complaint, the Plaintiff was responsible for reviewing relevant information and investigating the report/complaint and deciding if interim measures should be taken immediately pending the outcome of the investigation. It was important and part of the process for the Plaintiff to create a safe environment and provide support to the survivor/complainant including, but not limited to, counseling/health services, temporary housing, and class attendance excuses.

18. At the onset of an initial investigation, Plaintiff would determine if informal resolution processes such as mediation or a meeting would assist in a resolution (except in matters involving sexual misconduct), determine whether the facts of the complaint, if true, would constitute a violation of the TAMIU Student Code of Conduct.

19. If Plaintiff, as the Associate Vice President for Student Affairs/Title IX Deputy Coordinator, determined that the allegation involved sexual abuse, then he would be responsible for initiating an investigation within 5 university business days. Upon the initiation of the investigation, Plaintiff would select an investigative authority and meet with the selected individual(s) to go over the relevant facts, decide upon a course of action, and review timelines to ensure appropriate procedures are followed.

20. Between January 5, 2016 through January 19, 2016, the Plaintiff was leading a group of students in India as part of the "Reading the Globe" program. On or about January 12, 2016, Plaintiff was informed that a sexual assault allegedly occurred in Cork, Ireland as part of another study abroad program.

21. On January 12, 2016 (India Standard date), Plaintiff attempted to find out more information about the alleged sexual assault incident in Ireland but all that was shared with him was that there was an allegation of fondling and digital penetration between two students participating in the trip to Ireland. The Leadership Class to Ireland was led by Dr. Minita Ramirez, Vice President for Student Success (Plaintiff's direct supervisor) and Miguel Trevino, Director of Student Orientation, Leadership & Engagement (one of Plaintiff's associate directors).

22. All of Plaintiff's attempts to contact Dr. Ramirez were unsuccessful and communication with Mr. Trevino were limited. Additionally, Mr. Trevino indicated that he was unaware of the conversations Dr. Ramirez was having with TAMIU officials.

23. One of Plaintiffs responsibilities as the Deputy Title IX Coordinator was to reach out to any and all students who were alleging that they were victims of any sexual assault crimes. Plaintiff attempted to reach Triana Gonzalez, Associate Director of International Engagement, San Juanita Perez, Associate Director of Student Success Services, Mayra Hernandez, Director of Student Conduct and Community Engagement, and Gina Gonzalez, Associate Vice President of Student Success, to find out details of the incident in Ireland and plan appropriate Title IX plans and responses. Other than the original outcry submitted by the victim's roommate after finding the victim crying in the shower, no other details surrounding the events that transpired in Cork, Ireland were conveyed to the Plaintiff.

24. Plaintiff was extremely concerned that Title IX guidelines were not being followed, such as ensuring that there are absolutely no contact between the victim and accused student, contacting the designated emergency contacts for both students, and possibly removing

the accused student from the program at his own expense. Instead, the victim and the accused student were both transported on the same bus, made to attend the same class, and flew back on the same international flights.

25. Miguel Trevino created an audio recording of an interview he had with the accused student and ultimately was required to turn it over to the police in Ireland. The student was arrested and detained in Ireland.

26. Having attended many trainings on how to assist a victim, the Plaintiff is proficient in addressing the needs in these types of situations and the University had appointed the Plaintiff to make such decisions in Title IX situations involving students.

27. In 2011, the Federal Government addressed specific Title IX issues requiring federally-funded institutions – such as the Defendant – to use trauma informed approaches with regards to both the accused and the victim. However, no interim measures were taken in Ireland. Plaintiff was not contacted to implement any interim measures. Instead of having other accommodations made for him, the accused remained with the group and had to sleep in the same room as a faculty member.

28. Neither the accused nor the victim's parents were contacted – with or without their consent – pursuant to the TAMIU Study Abroad Policy for emergency situations like this.

29. All of the actions in violation of Title IX responsibilities could threaten Title IX funding for TAMIU and could lead to further sanctions. Plaintiff made all attempts that he possibly could while he was in India to insure the policies and procedures were followed.

30. In response to allegations of sexual assaults involving a student, TAMIU's Student Handbook indicates that the Plaintiff, serving as the Associate Vice President for Student Affairs (AVPSA) / Title IX Deputy Coordinator, "<u>shall</u> resolve these reports or complaints equitably and as promptly as practicable after the report or complaint is made." (Emphasis added.)

31. Additionally, the Handbook states that for all investigations, "The following procedures will be followed: 1. Within 5 University business days of receiving the complaint, the Associate Vice President for Student Affairs (AVPSA) / Title IX Deputy Coordinator <u>shall</u> perform all the following procedures: (a) Notify—and forward copies of the complaint as appropriate to University officials; (b) Assign an investigative authority; The investigative authority will be assigned based on status of the alleged respondent.…" The Plaintiff was attempting to perform his required duties as the AVPSA / Deputy Title IX Coordinator.

32. Had Plaintiff remained in India with his study abroad group, he would have been absent during a critical time in the Title IX Process, pursuant to the required procedures to be followed in the Handbook. Plaintiff, in his capacity as the AVPSA / Deputy Title IX Coordinator as well as the administrator in charge of the study abroad program, purchased the first available airline ticket to return to Laredo, Texas in order to be on campus the day prior to the first day of classes for the fall semester – January 19, 2016. Returning early would allow Plaintiff barely enough time to take appropriate Title IX action(s).

33. The first-class day of the Spring semester was to commence on January 20, 2016. The first-class day fell one day <u>after</u> the five-business day deadline established by TAMIU to respond to an investigation of a Title IX student incident. Plaintiff felt it was necessary for him

to promptly return to Laredo to properly address the matter because a Title IX student incident was one of his specific duties. In addition, had he not changed his flight, he would not have arrived in Laredo until after the end of the business day on January 19, 2016. Although the Texas A&M University System legal counsel team was advising TAMIU and Dr. Ramirez, Plaintiff was unaware of any Title IX actions being taken or any established procedures being followed. The proper procedures were not followed until Plaintiff initiated them on January 19, 2016 – on the deadline date.

34. Plaintiff was designated by TAMIU as the "on-call conduct officer" for all emergency situations involving students requiring immediate response or interim measures.

35. TAMIU's Study Abroad Program, has a budget set aside annually for emergency situations similar to this one. Plaintiff traveled approximately 30 hours (with a 10-hour time difference). He arrived in Laredo, Texas on or about January 18, 2016 at or around 5:00 p.m. The University was closed due to the Martin Luther King Holiday. He went to TAMIU the following morning, January 19, 2016 at 8:00 a.m.

36. On or about January 19, 2016, there was an all-administration-and-faculty assembly in the morning hours. Upon completion of the assembly, Plaintiff requested an emergency meeting to gather facts about the alleged sexual assault that had occurred in Ireland. Plaintiff wanted to send an interim suspension letter to the alleged assaulter, removing him from University premises while the investigation is conducted, which TAMIU had failed to do.

37. On or about January 19, 2016, Plaintiff met with the following individuals: San Juanita Perez, Mayra Hernandez, Lisa Paul (Associate Vice-President for Compliance), Sandra

Villanueva (Title IX Coordinator for Compliance Department), Dr. Minita Ramirez, Gina Gonzalez and representatives from the police department to discuss the incident that occurred in Ireland and to implement a plan of action. Plaintiff advised the group that TAMIU should place the student who allegedly sexually assaulted the victim (another student) on interim suspension. Plaintiff also requested that San Juanita Perez reach out to the student-victim. All agreed to the recommendations made by the Plaintiff. He was vocal during the meeting regarding his concerns of deficiencies in how the situation was handled by University Administration in Cork, Ireland.

38. For some reason, Dr. Minita Ramirez indicated to Plaintiff that she did not want him or anyone under his direction to handle the investigation. Plaintiff was always held in charge of overseeing the investigation of misconduct if it involved a TAMIU student. The investigation was not being conducted in accordance with the established TAMIU procedures published in the Student Handbook or the Title IX process.

39. On or after Monday, January 25, 2016, Plaintiff met in private with Dr. Minita Ramirez to discuss the handling of the Ireland incident. Dr. Ramirez quickly placed blame on herself for not taking the time to review the process. She had placed all the responsibility on Teresa Renn, Associate Director of Student Orientation, Leadership & Engagement, her co-director on the trip, to set up processes. However, Ms. Renn could not make the trip due to the birth of her child. Dr. Ramirez further indicated that it was "the stupid girls fault, por "mensa" (English translation, "dumb"). Again, the Plaintiff was vocal regarding his concerns of deficiencies in the handling of the matter after the assault charges were made.

40. Following the meeting with Dr. Ramirez, the Plaintiff, along with Triana Gonzalez, designed an additional training that provided tabletop (scenario) opportunities for

faculty to engage in discussions of situations regarding allegations of sexual assaults involving students.

41. At the time of the Ireland incident, there were already written and accepted procedures that were emailed to all executives and police dispatchers twice a year before summer and fall. Those procedures clearly directed that the Plaintiff was the primary contact for all incidents abroad and that all calls made through the University police department's emergency line would then be re-routed by contacting the Plaintiff for follow-up.

42. On or about February 1, 2016 but before March 1, 2016, the return flight change for the Plaintiff from India to Laredo, Texas (due to the sexual assault incident in Ireland and required Title IX procedures), was reconciled by the TAMIU travel department and submitted for payment. No issues were raised regarding the flight change.

43. On or after January 25, 2016 and before March 14, 2016, the Plaintiff met with David Halpern, University Legal Counsel, to discuss the Plaintiff's concerns regarding the mishandling of Title IX procedures on the Ireland trip. Plaintiff voiced his concerns with the mishandling of the case. Procedures were not followed. Mr. Halpern recognized that mistakes and possible violations were made by Dr. Minita Ramirez. Plaintiff notified Mr. Halpern that the University's policy when an alleged sexual assault occurs abroad is to notify the emergency contacts of the student(s). However, Mr. Halpern indicated that he was never made aware – by anyone from TAMIU on the Ireland trip – that such policy existed.

44. Before March 14, 2016, the Plaintiff received the Title IX alleged sexual assault investigation report that occurred in Ireland from Martha Gonzalez, the Director of Human

Resources. The report concluded the respondent responsible and his penalty was suspension from TAMIU for no less than one year.

45. On or after March 14, 2016, Plaintiff met with Dr. Minita Ramirez, Juan Castillo (Vice President for Finance and Administration), Trevor Liddle (Associate Vice-President for Administration), Lisa Paul, Triana Gonzalez, Sergio Moreno (Captain for the University Police Department), Adrian Dominguez (Safety & Risk Manager for the Compliance Department), Fructuoso San Miguel (Director of the University Police Department), and Sandra Villanueva. Yet again, the Plaintiff was very vocal regarding his concerns on how the Ireland situation was mishandled by the University.

46. At the March meeting, Plaintiff specifically mentioned that the established written University procedures were ignored, which also violated Title IX; no one in study abroad had any idea what was happening; although a "release to notify emergency contacts" was in the possession of TAMIU, the University staff on the Ireland trip failed to take the form into consideration; the University staff on the Ireland trip failed to provide all vital information to the legal team (in violation of Title IX); as well as other frustrations and concerns.

47. On or after April 1, 2016, Plaintiff was formally evaluated by Dr. Minita Ramirez. In this April 2016 evaluation, Plaintiff received all 5's in every category, which is the highest rating an employee may receive at TAMIU during employee evaluations.

48. On or after April 15, 2016, an audit of the Plaintiff's department and all his budgets was begun. The Plaintiff fully cooperated.

49. On or after April 15, 2016, Plaintiff met with Dr. Keck and Dr. Minita Ramirez, who was visibly upset and voiced her complete disapproval with the Plaintiff for his purchase of the flight change from India to Laredo to return early to address the Title IX concerns regarding the alleged sexual assault in Ireland.

50. On or about May 9, 2016, while away from campus during his lunch hour, Plaintiff received a phone call from Captain Sergio Moreno of the TAMIU Police Department. Captain Moreno requested the Plaintiff to return to TAMIU to speak with him regarding allegations of theft involving the Plaintiff.

51. Plaintiff returned to TAMIU to meet with Captain Moreno, who read *Miranda* rights to the Plaintiff. Under the direction of the TAMIU administration, Captain Moreno accused the Plaintiff of theft regarding purchases made by the Plaintiff with University funds including, but not limited to, the flight change that he made from India to Laredo in response to the sexual assault incident.

52. Plaintiff was shocked. He could not believe that he was being accused of such allegations when during his entire tenure at TAMIU all he aimed to do was good work. Plaintiff indicated to Captain Moreno that he was willing to fully cooperate but not without his attorney present. Captain Moreno told Plaintiff to return to his office.

53. While walking back to his office, however, Plaintiff was called on his cellular phone by Captain Moreno and was told to instead report to Human Resources. Plaintiff complied. Once at Human Resources, Plaintiff was told that he would be terminated, but not told why.

54. Plaintiff was then asked to resign in lieu of termination. He refused, saying that he did nothing wrong. The Human Resources personnel proceeded to give him a letter stating that his employment would be terminated effective May 23, 2016. He was placed on 2-weeks suspension with pay.

55. On or about May 20, 2016, prior to the effective date of the termination, Plaintiff returned to the Human Resources Department. Because he was fed up with the unfounded accusations, Plaintiff submitted his resignation in lieu of termination, as requested.

56. Plaintiff later found out that TAMIU refused to accept his resignation.

57. After the month of June 2016, a special prosecutor, Omar Escobar, the Starr County District Attorney, was appointed by the Webb County District Attorney's Office to investigate the alleged theft allegations filed by TAMIU against the Plaintiff. Mr. Escobar conducted a thorough investigation of all allegations alleged by TAMIU. In February of 2017, the special prosecutor provided a letter to the Plaintiff, TAMIU, and the Webb County District Attorney's Office indicating that all allegations against the Plaintiff were found to be "unwarranted and unsupportable."

58. Plaintiff sought unemployment benefits. On or after June 6, 2016, Plaintiff received from the Texas Workforce Commission a letter submitted by Martha O. Gonzalez, TAMIU's Director of Human Resources, stating that the reason for Plaintiff's employment termination was unauthorized use of System resources. Specifically, TAMIU cited the purchase of the earlier return flight ticket from India to Laredo.

### E.  Title IX Retaliation

59.     Title IX provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a).   Title IX also prohibits schools from retaliating against students, teachers, and administrators for opposing Title IX discrimination or participating in a Title IX proceeding.  *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176-77 (2005).  Courts apply the same standards for Title VII retaliation claims to Title IX retaliation claims.  *See, e.g., Fuhr v. Hazel Park School Dist.*, 710 F.3d 668 (6th Cir. 2013).  Title IX is "enforceable through an implied private right of action … for monetary damages as well as injunctive relief."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994).

60.     Plaintiff engaged in protected opposition to the Title IX discrimination through the mishandling of the sexual assault incident during the study abroad trip in Ireland.  He participated in the Title IX proceeding regarding the same.  He was vocal in his opposition and participation.  The exercise of such rights were known to the Defendant.  He was subjected to adverse employment action subsequent to or contemporaneous with the protected activity.  There was a causal connection between the protected activity and the adverse employment action. Defendant terminated Plaintiff's employment under false and pretexual reasons.

### F. Damages

61. As a direct and proximate result of Defendant's actions, Plaintiff suffered the following injuries and damages:

    a. Lost earnings;

    b. Loss of earning capacity;

    c. Damage to reputation in the past and future;

    d. Mental anguish in the past and future; and

    e. Loss of pension or retirement benefits.

### G. Attorney's Fees and Costs

62. Plaintiff is entitled to an award of attorney's fees and costs under 42 U.S.C. §1988(b).

### H. Jury Demand

63. Plaintiff demands a trial by jury.

## I.  Prayer

64.     For these reasons, Plaintiffs ask for judgment against Defendant for the following:

    a.     Actual damages;

    b.     Reasonable attorney's fees;

    c.     Prejudgment and post-judgment interest;

    d.     Cost of suit; and

    e.     All other relief the Court deems appropriate.

Respectfully submitted,

**LOPEZ PETERSON, PLLC**

By: /s/ Doanh "Zone" T. Nguyen
DOANH "ZONE" T. NGUYEN
Federal Bar No. 18449
Texas State Bar No. 00789517
Colonnade Square I
101 West Hillside, Suite 1
Laredo, Texas 78041
zone@lopezpeterson.com
(956) 718-2134 - Telephone
(956) 718-2045 – Facsimile

**ATTORNEY IN CHARGE FOR PLAINTIFF GERARDO ALVA**