UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

GERARDO ALVA,                    §
                                 §
            Plaintiff,           §
VS.                              §     CIVIL ACTION NO. 5:17-CV-144
                                 §
TEXAS A&M INTERNATIONAL          §
UNIVERSITY,                      §
                                 §
            Defendant.           §

## ORDER

Plaintiff Gerardo Alva sued Defendant Texas A&M International University (TAMIU) for retaliation under Title IX. (Dkt. No. 1). Defendant moved for summary judgment, arguing that Plaintiff did not engage in protected activity and that it fired Plaintiff for legitimate, nondiscriminatory reasons. (Dkt. Nos. 19, 24). Plaintiff disputes Defendant's claims and argues in the alternative that any reason Defendant proffers is pretextual. (Dkt. No. 23). The Court has carefully considered all pleadings and relevant case law and for the reasons stated below **GRANTS** Defendant's Motion for Summary Judgment (Dkt. No. 19).

## I. BACKGROUND[1]

Plaintiff began working at TAMIU in 2001 and became involved with the school's Title IX coordination and compliance efforts in 2009. (Dkt. No. 19-1 at 8–9). After new Title IX guidance came out in 2011, Plaintiff actively revised the student handbook and internal university policies to provide a student-driven perspective to

---

[1] The facts surrounding the Title IX sexual assault incident are uncontested. They are described in some detail given their relevancy to potential Title IX violations.

discussions about and implementation of Title IX. (*Id.* at 10). His Title IX advocacy earned him praise and a promotion to associate vice president for student affairs and deputy Title IX coordinator. (*Id.* at 11, 13). Plaintiff's direct supervisor was the vice president of student success, Dr. Minita Ramirez. The ultimate responsibility for the Title IX program rested with the University's Title IX coordinator, Sandra Villanueva. (*Id.* at 11, 16, 27). Two people served directly under Plaintiff: the director of student affairs, Miguel Trevino, and associate director of student success services, San Juanita Perez. (Dkt. No. 19 at 7).

As associate vice president, Plaintiff oversaw the international programs, including study-abroad programs, and often traveled internationally. (Dkt. No. 19-1 at 13). As deputy Title IX coordinator Plaintiff opened investigations into student complaints and, within five-business-days of receiving a student complaint, he assigned investigators. (Dkt. No. 19-4 at 34–37). Over winter break 2015–2016, two study abroad programs took place concurrently: one to India and one to Ireland. (Dkt. No. 19-1 at 16). Plaintiff traveled with the group to India, and his trusted colleagues, Dr. Minita Ramirez and Miguel Trevino, accompanied the students to Ireland. (*Id.*). It was the sexual assault in Ireland that sparked the chain of events leading to this case. (*Id.* at 17).

### A. The Ireland Incident

On January 12, 2016, Ramirez and Trevino learned that a male student had sexually assaulted a female student in the early hours of that morning. (Dkt. No. 19-9 at 19). Both rushed to meet with the victim, who first spoke to Ramirez and

then gave a statement to Trevino.[2] (Dkt. No. 19-5 at 23–24). Ramirez encouraged the victim to report the incident to Irish authorities and to call a family member, but she refused to do either. (*Id.*). Trevino then left to hear the male student's account while the victim stayed with Ramirez, finally falling asleep on the bed while Dr. Ramirez sat on the floor beside her all night. (Dkt. No. 19-5 at 26). Trevino reported the incident to San Juanita Perez, who immediately emailed a no-contact order to both the students, copying Plaintiff. (Dkt. Nos. 19-7 at 26–27; 20 at 3–4, 39–40).

The rest of the trip was a whirlwind of phone calls to Texas A&M attorneys, the TAMIU police department, Title IX coordinator and compliance officer, as well as other high-level administrators. Ramirez and Trevino were forced to waltz a delicate dance of respecting the 21-year-old victim's wishes, protecting the male student's rights, navigating the Irish legal system, complying with Title IX, and following internal TAMIU procedures—all while coordinating among different time zones and with spotty cell-phone reception. The legal team advised Ramirez to respect the victim's and the male student's wishes and not to call either person's emergency contact. (Dkt. No. 19-5 at 27–28). She was also informed about the intricacies and potential dangers of not reporting the incident to the Irish authorities. (*Id.* at 30).

Ramirez and Trevino did everything they could to protect and comfort the

---

[2] To protect the students' confidentiality, the Court will refer to them as "the victim" and "the male student."

victim, respect her wishes, and follow the advice of the legal and compliance departments at TAMIU. The victim remained emphatic that she did not want to go home or notify her emergency contact; she did not want the male student to go home; she did not want to travel separately from the group, miss out on any of the study-abroad activities, or in any way draw attention to herself. (Dkt. No. 19-9 at 21–23). With those parameters, Ramirez and Trevino worked together to keep the students separate: the male student stayed in a room with Trevino and the victim moved to a room on a different floor directly beside Dr. Ramirez; the students were never in the same tour-group; they boarded the bus separately and sat as far apart as possible; for the remainder of the trip the victim and male student had no interactions. (Dkt. Nos. 19-5 at 32–33; 19-9 at 21–23). The victim eventually agreed to report the incident to the Irish police, who arrested the male student and later released him. (Dkt. Nos. 19-5 at 31; 19-8 at 13, 15). Dr. Ramirez offered to fly back with the victim on a separate flight. (Dkt. No. 19-9 at 23). After the victim refused, the whole group flew back together. (*Id.*). Dr. Ramirez rearranged the students' seats so that the victim and the male student were in separate sections of the plane and boarded separately. (*Id.*).

### B. Plaintiff's Involvement

On the day of the incident, Trevino notified Plaintiff about the situation and offered to "provide . . . any details" Plaintiff needed. (Dkt. No. 20 at 11). Plaintiff had already been notified through the online reporting system and no-contact orders that Perez emailed to the students. (*Id.* at 3–4, 11, 39–40). Though difficult

because Plaintiff was several time-zones away and also had poor cell-phone reception, Ramirez and Trevino tried to keep Plaintiff apprised of the situation through telephone calls and WhatsApp chats. (*Id.* at 11–18). Plaintiff was able to raise his potential Title IX concerns about ensuring the students were separate, calling the emergency contacts, and possibly removing the male student at his own expense. (Dkt. Nos. 19-1 at 25; 20 at 14, 16). Plaintiff acknowledged that he could do little from India and that his boss had everything under control. (Dkt. Nos. 19-1 at 23; 20 at 16–17). Ramirez told Plaintiff that she was conferring with Texas A&M attorneys and to not "try[] to fix things from India." (Dkt. No. 20 at 16). She politely but firmly told him "[p]lease too many people involved creates confusion." (*Id.*).

Plaintiff was not satisfied. He wanted to be involved in the process. He wanted to ensure that TAMIU issued an interim suspension before start of semester and assigned investigators before the University-set five-day deadline. (Dkt. No. 19-1 at 31). So, Plaintiff directly disobeyed Ramirez's order to stay where he was and bought a $4,358.11 plane ticket from India to Laredo. (Dkt. No. 23 at 12). He arrived home one day earlier than scheduled. (*Id.*). Plaintiff admitted that Perez could have ordered the interim suspension in his absence as she did the no-contact order and he only needed access to email to approve the investigators Villanueva suggested. (Dkt. Nos. 19-1 at 36, 40; 20 at 26). Still, Plaintiff believed it was in the students' and University's best interests that he return early because the process would go "a little bit smoother." (Dkt. No. 19-1 at 36).

Plaintiff called a meeting on January 19, 2016, the day before spring-semester classes started. (Dkt. No. 19-1 at 40). At that meeting, the group issued an interim suspension letter to the male student. (*Id.*). A subsequent investigation substantiated the allegations, and the male student was suspended. (Dkt. No. 20 at 30–31).

A final "debrief meeting" was held in March. (Dkt. No. 19-9 at 31). The Title IX coordinator, Villanueva, scheduled that meeting "for a 'postmortem' review of the TIX Ireland case and discussion of how we can improve communication and handling of similar reports in the future." (*Id.*). Plaintiff raised several concerns at that meeting, such as a need to know and follow University procedures. (Dkt. No. 19-1 at 38). Many other faculty members also had concerns, including the vice president for finance and administration, Juan Castillo. (Dkt. Nos. 19-1 at 39; 19-9 at 37). After the meeting, Plaintiff created a new Title IX training based on the incident without any opposition from Dr. Ramirez or anyone else. (Dkt. No. 19-1 at 40).

### C. The Financial Investigation

The Finance Department began investigating the accounts of Plaintiff, Ramirez, and Trevino because of rumors that Plaintiff had flown from India to Ireland in the immediate aftermath of the incident without authorization and without disclosing the purchase. (Dkt. No. 19-9 at 38). During that investigation, the Finance Department uncovered several questionable transactions, an unreturned cash-advance for a trip Plaintiff had cancelled, an unpaid student loan

from 2005, and the $4,358.11 plane ticket. (Dkt. No. 19-10 at 21–24). "[S]ome of [Plaintiff's] purchases may have been for his personal use, including purchases for luggage, a water bottle, a travel wallet belt, two laundry hampers, a curtain, and a curtain rod." (Dkt. No. 19-10 at 21).

After the Finance Department reminded Plaintiff of the cash advance he had not returned since September, he repaid those funds. (Dkt. No. 19-12 at 2). When asked about the luggage, Plaintiff first denied using it, but later admitted that he had taken it as his personal luggage on the trip to India. (Dkt. Nos. 19-2 at 4; 19-10 at 23). Doubt also arose as to whether the items purportedly purchased as prizes had ultimately been given out as prizes. A prize log that Plaintiff submitted indicated that three individuals had won Fitbits. However, when the Finance Department called those three individuals, they reported that Plaintiff had only awarded them candy, DVDs, or other promotional items. (Dkt. No. 19-10 at 22). At the end of the investigation the total "amount of irregular, improper, or unaccounted for purchases" was $1,923.28, not including the plane ticket, loan, or late-returned cash-advance. (*Id.* at 21).

After learning about the results of the investigation, the University's president, Dr. Keck, determined that Plaintiff could not continue to work at TAMIU. Both Dr. Keck and Dr. Ramirez found the incident "heartbreaking," "shattering," and "upsetting." (Dkt. No. 19-12 at 2). Dr. Ramirez cried and wondered if there was a solution short of termination. (Dkt. No. 19-6 at 3–4). Dr. Keck, however, realized that although the plane ticket alone may not have merited

7

termination, the pattern of bad judgment and deceit left him no other choice. (Dkt. No. 19-12 at 1–2, 5). On May 9, 2016, TAMIU offered Plaintiff the choice between resignation and termination. (Dkt. No. 19-2 at 6). Plaintiff refused to resign. (*Id.*).

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden is on the movant to "demonstrate the absence of a genuine issue of material fact." *Id.* at 323. But the movant "need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). If the movant meets that initial burden, the nonmovant must produce "specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(emphasis omitted) (quoting FED. R. CIV. P. 56(e)). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citations omitted).

## III. ANALYSIS

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The express statutory means of enforcement is administrative, *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280 (1998), but Title IX also implies a private right of action, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 690–93 (1979). That private right of action allows money damages for intentional violations of Title IX, such as a fund-recipient's deliberate indifference to sexual harassment of one student by another student. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). In *Jackson v. Birmingham Board of Education* the Supreme Court expanded that private right of action: "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." 544 U.S. 167, 173 (2005). That cause of action applies even when the plaintiff is not a victim of the discrimination in the original complaint. *See id.* at 179.

Case law around Title VII guides interpretation of Title IX. *See Cummings v.*

*Tex. S. Univ.*, No. H–10–1096, 2011 WL 1750697, at *3 (S.D. Tex. May 6, 2011) (citations omitted) ("Courts generally look to Title VII as the appropriate analog for the legal standards in Title IX claims.").[3]   To establish a Title IX claim for retaliation based on circumstantial evidence the Court therefore applies the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff bears the initial burden of making a prima facie case for retaliation. *See id.* at 802.   Next, the burden shifts to the defendant, who must show a legitimate, non-retaliatory reason for termination. *See id.*   If the defendant establishes such a reason, the burden shifts back to the plaintiff, who can prove that the proffered reason is pretextual. *See id.* at 804.

### A. Prima Facie Case for a Title IX Retaliation Claim

To establish a prima facie case for retaliation under Title IX, the plaintiff must make three showings:  the plaintiff participated in a protected activity under Title IX,  the defendant took an adverse employment action against the plaintiff, and  participation in the protected activity caused the adverse employment action. *See Willis v. Cleo Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004)).   In this case, neither party disputes that Defendant took an adverse action against Plaintiff:  Defendant

---

[3] The court cites several other cases supporting that proposition: *Preston v. Va. ex rel. New Cmty. Coll.*, 31 F.3d 203, 206–07 (4th Cir. 1994) (applying Title VII's burden-shifting scheme to a Title IX retaliation claim); *Murray v. N.Y. Univ. Coll. Of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995) (same); *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996) (same); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (same); *Lowrey v. Tex. A&M Univ. Sys.*, 11 F. Supp. 2d 895, 911 (S.D. Tex. 1998) (same). *See also Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315–16 (10th Cir. 2017) (applying the same test to resolve a Title VII and Title IX claim).

terminated him. The Court thus only needs to determine (1) whether Plaintiff participated in a protected activity under Title IX, and (2) if so, whether that participation caused TAMIU to fire him.

### 1. Participation in Title IX Protected Activity

A review of the facts in this case supports the conclusion that Plaintiff did not engage in protected activity under Title IX. To engage in protected activity under Title IX, an employee must "'step outside the role' [of representing the company] or otherwise make clear to the employer that the employee was taking a position adverse to the employer." *See Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 628 (5th Cir. 2008).[4] In addition, the adverse position taken by the employee must be based on "'a reasonabl[e] belief that the employer was engaged in unlawful [Title IX] practices." *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (quoting *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)). Plaintiff contends two of his actions constitute protected activity under Title IX: (a) his purchasing a plane ticket back to Laredo from India, and (b) his voicing concerns about how TAMIU handled the Title IX incident in Ireland. (Dkt. No. 23 at 12–13). The Court will discuss each of these in turn.

#### a) Plane Ticket Purchase

Plaintiff did not step outside of his role as employee or otherwise make clear he was taking a position adverse to TAMIU when he purchased a $4,358.11 airfare

---

[4] The Fair Labor Standards Act (FLSA) is another analog for the relatively novel legal standards in a Title IX case. *See Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 598 (E.D. Pa. 2009) (explaining that the FLSA and Title IX have the same prima facie case elements for retaliation claims and using the FLSA standard for protected activity for a Title IX claim).

to return from India one day early. To allege protected activity an employee "must [have done] something outside of his or her job role in order to *signal* to the employer that he or she is engaging in protected activity." *See Hagan*, 529 F.3d at 628 (emphasis added). "[O]therwise typical at-will employment relationship[s] could quickly degrade into a litigation minefield." *Id.* Even though Plaintiff concedes that he purchased the ticket "solely" to perform his role as deputy Title IX coordinator, he later argues that the flight could not have been within his role as employee because he bought it in direct disobedience to Dr. Ramirez. (Dkt. Nos. 19-1 at 7; 23 at 12). But even accepting that argument, covert disobedience alone does not meet the requirements of protected activity. When Plaintiff flouted authority and bought the ticket, he did not "make clear" that he was taking a position adverse to the University nor "*signal* to the employer that [Plaintiff] [was] engaging in protected activity." *Hagan*, 529 F.3d at 628. Plaintiff, in fact, never told any of his superiors that he purchased the plane ticket. (Dkt. Nos. 19-1 at 24, 30; 19-11 at 37). Because Plaintiff did not make clear that he was engaging in an action adverse to TAMIU when he bought the ticket, he cannot now claim that the purchase was protected activity.

Plaintiff also did not reasonably believe that he had to purchase that plane ticket to ensure that TAMIU did not violate Title IX. Even accepting that Plaintiff was motivated by a concern for the students and compliance with Title IX, he admitted that he could have instead emailed Perez and asked her to issue an interim suspension, handle the initial meeting, and reach out to the student-victim.

(Dkt. No. 19-1 at 36, 40). Nor did Plaintiff need to be physically present to assign the investigators within the five-day, University-set deadline. (Dkt. No. 20 at 26). Plaintiff admits that all his potential Title IX concerns Plaintiff could have been addressed without his returning early and purchasing a $4,358.11 flight.[5] This situation is therefore akin to *Atkinson v. Lafayette College*, where the court found an employee did not engage in protected activity because Title IX compliance would have been achieved even if the university disregarded the employee's complaints. *See* 653 F. Supp. 2d at 600–02.

Plaintiff also states that he was concerned about potential deficiencies in the process. (Dkt. No. 19-1 at 30–31). Yet he knew that the HR compliance officer, the Title IX coordinator, and Texas A&M system attorneys were all advising Dr. Ramirez. (*Id.* at 19). Plaintiff, moreover, told Dr. Ramirez, "I know you've got this." (Dkt. No. 20 at 17). He conceded that he returned a day early not to forestall any illegality but to make the process go "a little bit smoother." (Dkt. No. 19-1 at 36). Because Plaintiff reasonably believed that Title IX could be complied with even if he did not purchase the $4,358.11 plane ticket and knew many qualified people were guiding the process, the purchase is not protected activity under Title IX.

### b) *Voicing Title IX Concerns*

The concerns Plaintiff raised about the Ireland incident were not outside his role as employee or clearly adverse to TAMIU. Plaintiff brought up issues on three

---

[5] Because Plaintiff's argument fails even assuming his cited concerns would have been violations of Title IX, the Court need not address whether his proposed concerns would actually constitute the violations of Title IX necessary for protected activity.

different occasions: during the Ireland incident, in a post-incident meeting with TAMIU's lead counsel David Halpern, and at a debrief meeting in March. (*Id.* at 28, 36, 38). During the Ireland incident, not only did Plaintiff not make clear he was taking a position adverse to TAMIU but he also supported Dr. Ramirez's decisions. (Dkt. No. 20 at 17 ("I know you've got this and let me know how I can help.")); *cf. Moore v. Phila.*, 461 F.3d 331, 341, 350 (3d Cir. 2006) ("'[T]he employee's opposition' to unlawful discrimination must not be equivocal.").

Plaintiff's discussion with Halpern and comments at the debrief meeting were part of his job. He admitted that he regularly met and raised concerns with Halpern as part of his job. (Dkt. No. 19-1 at 31; *see* Dkt. No. 19-5 at 38). Dr. Ramirez explained that Plaintiff's role also included debriefing after every event to improve the response the next time. (Dkt. No. 19-5 at 37). His comments were "not only *not adverse* to the [University]'s interests, [they were] exactly what the [University] *expect*[*ed*] of a [deputy Title IX coordinator]," to help TAMIU improve its future compliance. *See Hagan*, 529 F.3d at 628; (Dkt. Nos. 19-1 at 40; 19-5 at 37–38). In none of those instances did Plaintiff ever "cross[] the line from being an employee merely performing [his] job as [deputy Title IX coordinator] to an employee lodging a personal complaint . . . and asserting a right adverse to the [University]." *Id.* at 627 (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996)).

The concerns also were not based on a reasonable belief that Defendant engaged in illegal Title IX practices. Plaintiff voiced concerns about the failure to

14

notify the students' emergency contacts but acknowledged that the waiver form allowing that contact is not associated with Title IX. (Dkt. No. 19-1 at 20). Plaintiff mentioned TAMIU's failure to keep the victim and the male student adequately separated and to follow its own internal policies. But those factors are not themselves violations of Title IX or evidence of deliberate indifference. *See K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 787 (5th Cir. 2017) (holding that a school's failure to follow its procedures was not evidence of deliberate indifference (citing *Gebser*, 524 U.S. at 291–92)).

Deliberate indifference towards an allegation of sexual assault by one student against another is a violation of Title IX, *see Davis*, 526 U.S. at 642, but Plaintiff could not have reasonably thought TAMIU was deliberately indifferent and thus violating Title IX in this case. *Jane Doe v. Erskine College*, which Plaintiff cites to support that claim, holds that the question of whether the defendant in this case was deliberately indifferent should go to the jury. *See Jane Doe v. Erskine Coll.*, No. Civ.A. 8:04–23001RBH, 2006 WL 1473853, at *13 (D.S.C. May 25, 2006). That case, however, is nothing like the present case. In *Erskine College*, the school stopped supporting the victim once it discovered she was accusing a star athlete. *See id.* at *1. The dean "conducted his own investigation into the matter and [claimed] that the male student was very bright, very intelligent, and 'going places.'" *Id.* at *11. The school threatened to punish the victim if she brought charges, changed the procedures and created new ones to make it harder for her to bring a complaint, failed to inform her of the procedures, refused to comply with a no-contact order

issued by a magistrate, and assigned the perpetrator as lab assistant in one of the victim's classes. *See id.* at *11–13.

This case lacks any parallels: TAMIU immediately issued a no-contact order and did everything they could to keep the students separate while honoring the victim's wish that neither she nor the male student be sent home; Dr. Ramirez explained the options to the victim; both students were immediately offered counseling services; Ramirez and Trevino went to great lengths to keep the students separate; TAMIU issued an interim suspension as soon as it could; and it held a full investigation and hearing, in line with its policy, that ultimately found the male student guilty and suspended him. (Dkt. Nos. 19-1 at 26, 33, 39, 40; 19-5 at 25, 29–31; 20 at 17). Nothing in the facts even hints at deliberate indifference by TAMIU.

The most compelling evidence that Plaintiff could not reasonably believe that TAMIU was engaged in illegal activity relating to Title IX during this incident is his knowledge that Dr. Ramirez was constantly in contact with and following the advice of the associate vice president of compliance, an attorney who handles Title IX compliance, other Texas A&M system attorneys, the Title IX coordinator, the vice president for finance and administration, and the associate vice president for administration. (Dkt. No. 19-1 at 18–19). And Plaintiff admits that he is "not a legal expert" and not "more qualified to give legal advice about Title IX than attorneys." (*Id.* at 20, 36). Given Plaintiff's knowledge that many attorneys were making the decisions in this case, Plaintiff could not reasonably think that TAMIU was engaged in illegal Title IX practices, even if he did have concerns and

suggestions about improving or complying with TAMIU's internal procedures.

## 2. Causation

To prove the third prong of the prima facie case for retaliation, Plaintiff must show that the protected activity was a but-for cause of his termination. *See Zamora v. Hous.*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). At this stage Plaintiff need not prove his Title IX protected activity was "the sole factor motivating [his] termination." *Cummings*, 2011 WL 1750697, at *4 (citing *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 558 (S.D. Tex. 1999)). Even though "the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of his protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 n.6 (5th Cir. 2003) (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). If Plaintiff leaps that initial hurdle, the inquiry becomes "highly fact specific," taking into account factors such as "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination." *See Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir. 2010) (citing *Nowlin v. Resolution Trust Co.*, 33 F.3d 498, 508 (5th Cir. 1994)). The Court will once again look at the two alleged protected activities in turn.

### a) *Plane Ticket Purchase*

Dr. Keck, the final decisionmaker, knew that Plaintiff had purchased the

plane ticket before he fired him. (Dkt. No. 19-12 at 2). The Court thus must analyze other factors to determine whether that purchase was a but-for cause of Plaintiff's termination.

Although Plaintiff had no disciplinary record prior to termination, all other factors weigh against finding the requisite causal connection. Defendant treated Plaintiff the same as all other employees throughout the entire process: the investigation, the manner of termination, and the reasons for termination. The Finance Department investigated not only Plaintiff but also Ramirez and Trevino in connection with a ticket purchase. (*Id.* at 38). Plaintiff being escorted off campus, asked to turn in his keys, and offered either a termination or resignation letter were all "normal procedure[s]." (Dkt. Nos. 19-6 at 4–5; 19-10 at 6; 19-12 at 5). And in the only other reported case of theft, TAMIU also dismissed that employee. (Dkt. No. 19-12 at 5).

More strikingly, the lack of temporal proximity between Plaintiff's airfare purchase and his termination undermines arguments of causality and militates against finding but-for causality. A lack of temporal proximity is evidence of a lack of causal connection but is not determinative, *see Starnes v. Wallace*, 849 F.3d 627, 634 (5th Cir. 2017) (citing *Gee v. Principi*, 289 F.3d 342, 346 n.3 (5th Cir. 2002)). For temporal proximity to be "sufficient evidence of causality . . . the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3–

18

month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir. 1992) (4–month period insufficient)).[6] Here, nearly four months passed between the purchase of the plane ticket and Plaintiff's termination, which, standing alone, is insufficient to establish the requisite temporal proximity.[7] (Dkt. Nos. at 19-2 at 6; 19-9 at 24–30).

A lack of temporal proximity can be overcome if there was animosity towards the plaintiff between the protected activity's occurrence and the termination. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42–43 (5th Cir. 1992) (holding that boss's consistent harassment of plaintiff about filing an EEOC claim, "trying to run [her] off," and the sudden appearance of complaints about performance mended the 14-month gap between the filing of the complaint and termination). There is no evidence of any animosity. After all of Plaintiff's alleged protected activity, Dr. Ramirez still wrote him a "very favorable" evaluation. (Dkt. No. 19-5 at 18–19). He

---

[6] *Compare Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 950 (5th Cir. 2015) (finding an approximately seven-week gap sufficient) and *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001) (finding five-day gap sufficient) *with Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 171 (5th Cir. 2014) (finding ten-month gap insufficient) and *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 803–05, 809 (5th Cir. 2007) (finding three-and-a-half-month gap insufficient). *But see Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 368 (5th Cir. 2013) (finding three-month gap sufficient when coupled with gradually diminished duties over those three months); *Weeks v. NationsBank, N.A.*, No. Civ.A.3:98–CV–1352M, 2000 WL 341257, at *3 (N.D. Tex. March 30, 2000) (finding a four-month time lapse could be sufficient (citing *Garrett v. Constar Inc.*, No. Civ.A. 3:97–CV–2575, 1999 WL 354239, at *5 (N.D. Tex. May 25, 1999))).

[7] Plaintiff argues that the relevant time of the adverse action for temporal-proximity analysis is when the investigation started. (Dkt. No. 23 at 18). But Plaintiff also agrees that the termination was the adverse action. (Dkt. No. 23 at 15 ("Adverse action against the Plaintiff is uncontested. His employment was terminated.")). If Plaintiff's first contention stood, none of the decisionmakers would have knowledge of the ticket purchased, and Plaintiff's claim would fall on that ground. The Court thus uses the date of termination as the date of the adverse action for this analysis.

continued to participate fully in meetings. He even created a new Title IX, faculty training based on the experience in Ireland without any opposition. (Dkt. No. 19-1 at 40). The lapse in time between the alleged protected activity and Plaintiff's termination, without any interim hostility, weighs against finding that conduct to be a but-for cause of the termination.

Plaintiff also argues that the ticket purchase incited the investigation, which led to the discovery of questionable charges and eventually led to termination. (Dkt. No. 23 at 16). Plaintiff concludes that the ticket purchase was therefore a but-for cause of Plaintiff's termination. However, a discriminatory motive must underlie the but-for cause of the termination. *See Zamora*, 798 F.3d at 331 (explaining that in retaliation cases a plaintiff must meet a high standard of causation and must show the discriminatory motive was not only a motivating factor but also a but-for cause of the termination (citing *Nassar*, 570 U.S. at 348–49, 361–62)). And there is no evidence that a discriminatory motive sparked the investigation. That the finance department began an internal review of several faculty members' accounts based on the rumor of an unauthorized ticket purchase does not demonstrate but-for causality between Title IX protected activity and Plaintiff's termination.

### b) *Voicing Title IX Concerns*

There is no evidence that Dr. Keck knew of any of the Title IX concerns Plaintiff raised before terminating him. Dr. Keck did know about the Ireland incident and, during his deposition, was not surprised to find out that Plaintiff had

voiced some concerns with how the situation in Ireland was handled. (Dkt. No. 23 at 19). Plaintiff argues that it follows that Dr. Keck knew that Plaintiff had raised specific Title IX concerns prior to terminating him. (*Id.*). But just because Dr. Keck "encouraged a culture of free[,] open[,] and uninhibited exchange of opinion," and so was not surprised that his employees felt comfortable voicing concerns, does not prove that Dr. Keck knew specifically that Plaintiff had raised concerns about Ireland in relation to Title IX. (Dkt. No. 19-11 at 36). Plaintiff has therefore failed to produce any evidence showing that Dr. Keck knew of the comments Plaintiff made. *See Collins v. Jackson Pub. Sch. Dist.*, 609 F. App'x 792, 795 (5th Cir. 2015) ("Unless a defendant knows that a plaintiff 'engaged in any protected activity' at the time of the alleged retaliation, causation has not been shown." (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999))). Plaintiff must now rely on the "cat's paw theory" to overcome that initial hurdle.

To prove retaliation under the cat's paw theory Plaintiff must show first that someone motivated by retaliatory animus influenced Dr. Keck to terminate Plaintiff and next that those actions were a but-for cause of Plaintiff's termination. *Zamora*, 798 F.3d at 331–32. Plaintiff argues that both the financial advisor and Dr. Ramirez provide the causal link under this theory. (Dkt. No. 23 at 20–21). The facts, however, do not support that assertion. Although Dr. Keck conferred with both of them before terminating Plaintiff, no evidence suggests that either of them harbored retaliatory animus against Plaintiff. All the evidence, in fact, points the other way. According to Plaintiff, Dr. Ramirez was comfortable with and used to

disagreements—she encouraged them. (Dkt. No. 19-1 at 12, 16, 27). She considered herself a mentor to Plaintiff and was distraught when she found out he had stolen from TAMIU. (Dkt. Nos. 19-5 at 18; 19-12 at 2). She even tried to persuade Dr. Keck to find a way to punish him short of dismissal. (Dkt. No. 19-6 at 3–4). Such actions fly in the face of finding she was motivated by retaliatory animus against Plaintiff for voicing Title IX concerns and flatly contradict that she influenced Dr. Keck to fire Plaintiff.

Plaintiff also fails to produce any evidence that Castillo, the vice president of finance and administration, harbored retaliatory animus against Plaintiff. After all, Castillo himself had concerns about how the incident was handled, many of which were the same as Plaintiff's concerns. (Dkt. Nos. 19-5 at 37; 19-9 at 37). And although Castillo presented the report outlining Plaintiff's indiscretions to Dr. Keck, Castillo did not compile the information. (Dkt. Nos. 19-9 at 39–40; 19-10). Because the evidence presented only casts doubt on a retaliatory motive and influence, Plaintiff has not met the burden necessary to show prima facie causation for the alleged Title IX complaints.

Construing all the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact as to (1) whether Plaintiff was involved in protected activity or (2) whether knowledge of any Title IX activity caused Plaintiff's termination. Plaintiff thus has failed to establish the requisite prima facie case and his claims cannot survive summary judgment.

## B. Legitimate, Non-Retaliatory Reason

Even assuming, however, that Plaintiff did establish a prima facie case for retaliation under Title IX, his claim fails. Under the *McDonnell-Douglas* framework, if a prima facie case is made, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the adverse employment action. *See Cummings*, 2011 WL 1750697, at *3 (first citing *McDonnell Douglas*, 411 U.S. at 802; then *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008); and then *Lowrey*, 11 F. Supp. 2d at 911). Defendant's "burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). Defendant has met that burden.

TAMIU claims it terminated Plaintiff for dishonesty, bad judgment, and misuse of state resources. An investigation into Plaintiff's accounts revealed the $4,358.11 spent on a ticket to return from India in direct contradiction of Dr. Ramirez's order. (Dkt. Nos. 19-10 at 21; 23 at 12). It also revealed a pattern of questionable purchases, unpaid TAMIU tuition and book loans from 2005, and an unreturned cash advance for a trip to Brazil that was cancelled. (*Id.*). "[T]he amount of irregular, improper, or unaccounted for purchases total[ed] $1,923.28." (*Id.*). Though Dr. Keck believed that the plane ticket purchase showed "colossal bad judgment" and "insubordination," he would not have terminated Plaintiff for that purchase alone. (Dkt. No. 19-12 at 1–2, 5). The combination of the unauthorized purchases, the blatant dishonesty, and failure to pay back money borrowed or

advanced, led Dr. Keck to his decision—he must terminate Plaintiff. (*Id.* at 1–2). Defendant has thus carried its burden by providing a legitimate, non-retaliatory reason for termination.

### C. Reason as Pretext

The final stage of the *McDonnell–Douglas* framework shifts the burden back to the plaintiff, allowing him to survive summary judgment by proving that the legitimate, non-retaliatory reason provided is only a pretext for the actual retaliatory reason. *See Cummings*, 2011 WL 1750697, at *3 (citing *Reeves*, 530 U.S. at 143). The ultimate burden remains with the plaintiff, and "[a] plaintiff cannot prove pretext simply by grounding his claim in a mere belief that an employer acted with a discriminatory or retaliatory motive." *Id.* at *5 (citations omitted). "A plaintiff may show pretext 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 519 (1993)). Even construing all facts in his favor, Plaintiff does not meet that burden.

Plaintiff offers no evidence of disparate treatment. He was terminated for dishonesty and theft charges. (Dkt. No. 19-12 at 1, 5). The only other employee accused of theft was also terminated. (*Id.* at 5). He was escorted off campus after

termination and his computer was locked; those were standard termination procedures. (Dkt. Nos. 19-6 at 4–5; 19-10 at 6; 19-12 at 5). The finance department did not inform him that he was being investigated. (Dkt. No. 19-2 at 1). Neither did it inform Ramirez or Trevino. (Dkt. No. 19-10 at 3). TAMIU offered him the option to resign; that is protocol. (Dkt. Nos. 19-2 at 6; 19-12 at 5). TAMIU filed charges against Plaintiff at the advice of an assistant district attorney (ADA); the policy is that charges are pressed in every case a crime has been committed and the ADA recommends it. (Dkt. No. 19-10 at 6–7). Plaintiff does not offer any evidence of disparate treatment, and the Court will not find pretext based on that ground.

Plaintiff thus must establish pretext by proving that Defendant's proffered explanation is "unworthy of credence." He fails to do that. A plaintiff can show an explanation is "unworthy of credence" by illuminating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *See Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 317 (5th Cir. 2015) (quoting *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002)).[8] Plaintiff argues that such an inconsistency is found between the reasons now proffered and those provided in a letter to the Texas

_____

[8] This standard originated in the Third Circuit in 1994 and has since been accepted as binding precedent in eight circuits. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644–45 (3d Cir. 2015) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Skiba v. Ill. Ctr. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018); *Micheo-Acevedo v. Stericycle of P.R., Inc.*, 897 F.3d 360, 367 (1st Cir. 2018); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016); *Dep. of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011); *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002); *White v. W.R. Winslow Mem'l Home, Inc.*, 211 F.3d 1266, at *3 (4th Cir. 2000).

Workforce Commission. (Dkt. No. 23 at 17). That letter asserts, "[Plaintiff] was terminated from employment for unauthorized use of system resources." (Dkt. No. 23-1 at 31). The letter also cites purchasing a $4,358.11 ticket in admitted disobedience to a supervisor's order as part of the termination calculus. (*Id.*). Nothing in that letter is inconsistent with the reasons offered by Defendant today. Both of those reasons, along with others, have consistently been given.

Plaintiff also argues that the special prosecutor's determination that "formal criminal charges are unwarranted and unsupportable" show weakness in the proffered reasons and prove pretext. (Dkt. Nos. 23 at 21; 28-1 at 2). The burden in a criminal prosecution—to persuade the jury beyond a reasonable doubt—is much higher than the burden on an employer to "produc[e], not persua[de]." *See McCoy*, 492 F.3d at 557. That the theft allegations could not meet the very different burden set for criminal prosecution in no way proves that the concerns about dishonesty, bad judgment, and misuse of state resources are pretextual.

Other factors also support a finding that the proffered reasons are not pretextual. TAMIU had always encouraged Plaintiff to implement his Title IX policies. He worked with Title IX for seven-and-a-half years before his termination. (Dkt. No. 19-1 at 9). In those years he rewrote portions of the student handbook, crafted internal policies and procedures from a student-focused perspective. (*Id.* at 10). He was praised and promoted for his efforts. (*Id.* at 11–13). Even after the Ireland incident, he devised Title IX trainings without opposition and testified that his colleagues listened without hostility when he voiced his Title IX concerns at the

debrief meeting in March. (*Id.* at 34). Logic defies a finding that Defendant terminated Plaintiff for his Title IX advocacy when Defendant has only ever encouraged that work. Additionally, Plaintiff not only does not dispute the veracity of the instances cited for his termination, but he also explicitly confesses to certain accusations, such as using the luggage purchased with state funds for personal use. (Dkt. No. 19-2 at 3–5). Nothing in the record persuades the Court that the proffered reasons are pretextual.

Even viewing the evidence in the light most favorable to Plaintiff, the Court holds that a reasonable jury could not find TAMIU's reasons pretextual.

## IV. CONCLUSION

This case presents no issues of material fact. Construing all evidence in the light most favorable to Plaintiff, he fails to establish a prima facie case for retaliation under Title IX. And even if he did, his claim still fails because Defendant has shown a legitimate, non-retaliatory reason for terminating Plaintiff, and Plaintiff has not met the burden of proving that reason to be pretextual. Defendant's Motion for Summary Judgment (Dkt. No. 19) is therefore **GRANTED**, and all of Plaintiff's claims are dismissed with prejudice. Final Judgment in favor of Defendant will accompany this Order.

It is so **ORDERED**.

**SIGNED** October 31, 2018.

Marina Garcia Marmolejo
United States District Judge